Harvey GELFAND, a minor, by his father and next friend, Herman Gelfand, Plaintiff,

v.

STROHECKER, Inc., a corporation, Defendant.

Judy GELFAND, a minor, by her father and next friend, Herman Gelfand, Plaintiff,

v.

STROHECKER, Inc., a corporation, Defendant.

Rose GELFAND, Plaintiff,

v.

STROHECKER, Inc., a corporation, Defendant.

Civ. A. Nos. 29571–29573.

United States District Court
N. D. Ohio, E. D.

Aug. 1, 1956.

A. H. Dudnik, Sam Komito, Cleveland, Ohio, for plaintiffs.

Thomas E. Antonelli, Youngstown, Ohio, for defendant.

WEICK, District Judge.

These cases were consolidated, and tried before a jury, resulting in verdicts in favor of the plaintiffs (Rose Gelfand for $10,000, Harvey Gelfand, a minor for $3,500 and Judy Gelfand, a minor for $1,000).

Written interrogatories were submitted by the Court to the jury under Rule 49(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., which were answered as follows:

"Interrogatory No. 1.

"Was the defendant negligent? If so, of what did it consist? Answer. Yes. Not using due caution considering weather conditions of the highway."

"Interrogatory No. 2.

"Was Herman Gelfand negligent? If so, of what did it consist? Answer. Yes. Not using due caution considering weather conditions of the highway."

"Interrogatory No. 3.

"Do you find that the defendant operated its truck onto plaintiffs' right-hand portion of the highway, to-wit: the westerly half thereof, so as to cause Herman Gelfand to attempt to avoid an imminent collision on the truck's wrong side of the road, thereby forcing Gelfand to operate his automobile on his left side of the highway, namely, the east side thereof. Answer: Yes or no. No."

"Interrogatory No. 4.

"Do you find that the injuries sustained by the plaintiffs proximately resulted: (a) From the negligence of the defendant; (b) From the combined negligence of Herman Gelfand and the defendant; or (c) From the sole negligence of Herman Gelfand? Answer. B. Not using due caution considering weather conditions of the highway."

The defendant moved for a directed verdict at the close of plaintiffs' evidence, and at the close of all the evidence, ruling on which was reserved by the Court. Upon the rendition of the verdicts, judgments were entered in favor of the plaintiffs.

The defendant has now moved to set aside the verdicts and judgments and

to have judgments entered in its favor in accordance with its motion for directed verdicts. Rule 50(b), Federal Rules of Civil Procedure.

The defendant claims that there was no substantial evidence of its negligence, and that in any event the sole proximate cause of the injuries of the several plaintiffs was the negligence of the driver of their automobile.

The accident happened, in broad daylight, on the morning of January 28, 1952 on State Route 90 in Mahoning County, Ohio. It had been snowing and the roadway was icy and slippery.

The roadway had only two lanes for travel and extended generally in a northerly and southerly direction and was improved. There was an "S" curve in the roadway which commenced at about the place where the accident took place. Appropriate signs had been erected by the State Highway Department indicating the presence of the curve.

The plaintiffs were on their way from Cleveland to Florida in a Cadillac automobile owned and operated by Herman Gelfand, husband of Rose Gelfand, and father of the two minor plaintiffs. Gelfand had filed no action for his own injuries or for damages to his automobile.

Gelfand was operating his automobile in a southerly direction and the defendant was operating his truck in the opposite direction or northerly when a collision occurred between the two vehicles on the easterly lane of the roadway within four feet of the east berm. This lane was the right side of the road for the truck and the wrong side of the road for the automobile in which plaintiffs were riding. Of this there was no question.

The complaints, in identical language, alleged that "the driver of the defendant corporation's truck operated said truck onto plaintiffs' right-hand portion of said Route 90, to wit: the westerly half thereof; that in order to avoid a collision with said truck, [Gelfand] pulled his automobile to his left, to wit: to the east, at which time the driver of defendant corporation's truck carelessly and negligently operated said truck back onto his right-hand portion of said Route 90, so as to cause a collision between the automobile in which the plaintiffs were riding and the defendant corporation's truck, * * *." (Complaint, par. 3)

This identical claim was also charged as a specification of negligence in the complaint. (Complaint par. 4(d) )

This same claim was repeated by counsel for plaintiffs in his opening statement to the jury when he said:

"The evidence will show that when this truck was about 150 feet or so away from Mr. Gelfand—who was the driver—he then took particular notice—he might have seen it before—but at that time he took particular notice of the truck because it was then approaching him.

"The evidence will show that it was then on its proper or right-hand side of the road, and that would be to the east side of the road.

"The evidence will show that they both lessened the distance between themselves because they were approaching each other; and that the truck—defendant's truck —went—around 20 feet from the Gelfand automobile came over onto the Gelfand automobile side of the road, in other words, the westerly half of that road.

"Now, the evidence will show that when Mr. Gelfand was confronted with this truck coming straight at him on his side of the road, he swung his vehicle to the left or to the left-hand side of his left-hand side of the road, or the easterly half of the road, to try to get out of the way of this oncoming truck.

"The evidence will show that at the same time, the operator of

the truck—who apparently had lost control of the truck and came over on his side of the road—tried again to get his vehicle onto the right-hand side, and he did at that point. So that the accident—the actual impact—occurred on the truck's side of the road where Mr. Gelfand was cutting across, and that the front of the truck came into contact with the right side of the Gelfand automobile.

"Now, the evidence will show that the reason for Mr. Gelfand's going onto the left or his wrong side of the road at that time was the approaching vehicle coming at him, and at that time he thought that was the best way to attempt to avoid an accident."

Herman Gelfand, herein referred to as Gelfand, testified that he was driving between 25 and 35 miles an hour, although in his deposition taken in April 1953, he had testified that his speed was 35 miles an hour.

He testified, that when he first saw the truck, it was coming from the opposite direction, on its own side of the road, and 150 feet away.

The truck was still on its right side of the road when he saw it 100 feet away.

The truck was still on its right side of the road when he again saw it 50 feet away.

He then saw the truck when it was from 20 to 25 feet away. At this time, he testified the truck was on its wrong side of the road coming directly at him and he was then on his right side of the road.

Gelfand testified that he blew his horn and turned to the left onto the left side of the road to avoid a head-on collision with the truck and the truck driver then turned to his right and got back on his right side of the road where the collision took place.

Gelfand admitted that the collision took place on his wrong side of the road and the right side of the road for the truck.

He had not applied his brakes or slowed down and at the time of the accident was traveling at the rate of 35 miles an hour.

He did not see any signs indicating the presence of a curve. He said that he passed no other cars after leaving Poland.

Gelfand was questioned on cross-examination as to whether he saw or talked with any officer of the State Highway Patrol, and he testified that he did not remember.

The fact was, however, that he gave a written statement, in his own hand-writing to Patrolman Robert E. Kettlewell and Patrolman Spindler of the State Highway Police on the same day as the accident.

This statement was as follows:

"I, Herman G. Gelfand, do hereby make the following statement of my own free will and accord concerning a motor vehicle accident which occurred on Highway 90 on the 28th day of January, 1952:

"I was traveling south on Route 90 about 25.

\*      \*      \*      \*      \*      \*

"I saw a truck coming north towards me. If I turned right, I would knock a car off the road, so I pulled towards my left. Next I knew, I was in ditch. My wife thrown through the windshield."

Rose Gelfand testified that their automobile was traveling between 25 and 35 miles an hour on her right side of the road. She saw the truck approaching, when it was right in front of them on its wrong side of the road and 20 feet away and her husband swerved his automobile to the left; that the collision took place on her left side of the road. In her deposition, she had testified that the automobile was traveling at 35 miles an hour; that she did not see any road signs indicating a curve; that the road looked straight; that she

did not observe any automobiles in front of them before the accident.

Cecil Sowers testified that he lived about ¼ of a mile north of where the accident took place and was backing his car out of his driveway when Gelfand drove by; that the road was covered with ice; that Gelfand was going about 25 miles an hour when he passed Sowers; that Sowers saw no other vehicle going south; that Sowers heard the crash, but did not see the accident take place; that after Sowers saw Gelfand, Sowers drove his car forward in his driveway up to his home; that after the accident Sowers went to the scene; that the automobile was in the east ditch facing south and the truck was about 15 feet north of the automobile heading west.

The minor children did not testify as to the facts of the accident. Defendant called no other witnesses as to the facts.

Robert E. Kettlewell, a State Highway patrolman, called as a witness for the defendant, testified that he arrived at the scene of the accident about 15 minutes after the accident took place.

He determined the point of impact of the vehicles from the debris on the highway, which was in the easterly lane about four feet from the east berm. The pavement was 19 feet wide and was surfaced with macadam. There were skid marks made by the automobile extending in a southerly direction, from the point of impact, a distance of 30 feet to the ditch; that there were no obstructions to the view except the "S" curve; that the curve was to the right for the truck and to the left for the automobile; that the lanes were marked; that the roadway was icy. He identified the statement made by Gelfand. (Deft's Ex. "D")

A. C. Strohecker, an officer of the defendant corporation, testified that he was driving its 1½ ton Studebaker truck north on Route 90 about 25 or 30 miles an hour on his right side of the road; that he noticed traffic coming south and the next thing he saw was a Cadillac car passing a black car and coming toward him at a good rate of speed on the wrong side of the road and about 150 to 200 feet away; that the road was covered with black ice; that he applied his brakes, but there was not a thing he could do; that the collision took place on his right side of the road 4 to 5 feet from the east berm.

On cross-examination, Strohecker testified that he saw the Cadillac car on his side of the road 150 feet or more away. He was asked within what distance he could stop going 30 miles an hour. He answered "quite a distance, because the road was black ice." He was then asked what is quite a distance. His answer was "Oh, it would be folly to try to stop a car under five or six lengths of that truck." Question: "Five or six lengths?"

"How long is that truck?" Answer. "The truck is at least 20 feet long, maybe 21." Question. "So that you could have brought that vehicle to a stop in 100 to 105 feet, is that correct?" Answer. "It would be very difficult and very dangerous. * * *."

He said that, as soon as he saw the approaching automobile deviate he applied his brakes and was traveling from 10 to 12 miles an hour on his own side of the road at the time of the accident.

The jury pulled the rug out from under plaintiffs' case when they answered "No" to Interrogatory No. 3.

The whole basis of plaintiffs' case, fantastic as it may seem, was that the truck came over on plaintiffs' right side of the road and when the vehicles were only 20 feet apart, Gelfand blew his horn and, to avoid a head-on collision with the truck, he went over on the left side of the road and the truck then went back on its right side of the road where the collision occurred.

The jury, in its answer to Interrogatory No. 3, found that no such thing happened, and answered the interrogatory "no". It would have been a physi-

cal impossibility for the accident to have occurred in the manner related by the Gelfands.

All of the witnesses, including both Gelfand and his wife Rose, testified that the accident took place on the truck's right-hand side of the road.

The jury could not have believed the testimony of Herman and Rose Gelfand and answered "no" to Interrogatory No. 3.

Gelfand was on the wrong side of the road, but the truck did not cause him to be there.

Strohecker swore that Gelfand was on the wrong side of the road, passing a black automobile at the time.

Gelfand's statement, in his own handwriting, which he gave to the State Highway patrolman on the day of the accident was:

"I saw a truck coming north towards me. If I turned right, I would knock a car off the road, so I pulled towards my left."

There must have been a car to his right, which he was passing at the time, and which he would have knocked off the road, if he had turned to the right, so Gelfand pulled to the left. After the collision occurred, he proceeded 30 feet further into the ditch. Gelfand's car probably skidded on the ice because its right front fender and side were damaged.

■ The truck was on its own side of the road, where it had a right to be, at the time of the collision, and previous thereto. The truck driver was not required to be on the lookout for persons who might violate the law. He had the right to assume that the drivers of other vehicles would obey the law. Hangen v. Hadfield, 135 Ohio St. 281, 20 N.E.2d 715.

Ohio General Code Section 6307–25 (1) now Ohio Revised Code Section 4511.25 provided: (in part)—

"Upon all roadways of sufficient width a vehicle * * * shall be driven upon the right half of the roadway, except as follows: (1) When overtaking and passing another vehicle proceeding in the same direction or when making a left turn under the rules governing such movements; * * *."

■ Violation of this statute was negligence per se. Brandt v. Mansfield Rapid Transit, Inc., 153 Ohio St. 429, 92 N.E.2d 1; Simko v. Miller, 133 Ohio St. 345, 13 N.E.2d 914; Mahoning Savings & Trust Co. v. Kellner, 131 Ohio St. 69, 1 N.E.2d 616; Patterson v. George F. Alger Co., Ohio App., 112 N.E.2d 65.

Ohio General Code Section 6307–26 now Ohio Revised Code Section 4511.-26 provided:

"Operators of vehicles * * * proceeding in opposite directions shall pass each other to the right * * *."

■ A violation of this statute was negligence per se. Johnson v. Thompson, 35 Ohio App. 91, 172 N.E. 298.

■ Ohio General Code Section 6307–29 now Ohio Revised Code Section 4511.29 provided:

"No vehicle * * * shall be driven to the left of the center or center line of the roadway in overtaking and passing traffic proceeding in the same direction unless such left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made without interfering with the safe operation of any traffic approaching from the opposite direction or any traffic overtaken."

Gelfand offered no excuse for being on the wrong side of the road, except the one which the jury, in answer to Interrogatory No. 3, found was false. He, therefore, had no valid excuse and was guilty of negligence as a matter of law. Lagos v. Kahler, 99 Ohio App. 214, 132 N.E.2d 254; Jackson v. Frederick, 152 Ohio St. 423, 89 N.E.2d 645.

Just how the truck driver, proceeding on the icy road, could have averted a collision with the Cadillac automobile, proceeding in the opposite direction on the wrong side of the road at the rate of speed of 35 miles an hour, does not appear.

■ True, the truck driver might have driven over on the left side of the road or to his right into the ditch, if he had sufficient time to do so. There is no proof that he had time and, in any event, he was under no legal obligation to get off the highway or go on the wrong side of the road in order to escape from being hit by one who was violating the law. Before negligence may be predicated upon the failure to act, there must be a violation of a duty and here there was no such duty. Mahoning Savings & Trust Co. v. Kellner, supra; Baier v. Cleveland Ry. Co., 132 Ohio St. 388, 8 N.E.2d 1.

■ But it is said that the truck was not under control; that the truck driver was going too fast; that he did not stop or lessen his speed and that this was negligence in view of the weather and the icy condition of the road.

These claims are not sustained by the evidence. The truck driver had been traveling 25 to 30 miles an hour and slowed down to 10 or 12 miles an hour at the time of the accident. If, in the exercise of ordinary care, he would have been able to bring his truck to a complete stop (and there is no such evidence), he still could not have averted the collision with the Cadillac which was traveling at the rate of 35 miles an hour in the opposite direction and on the wrong side of the road. The driver of the Cadillac did not slacken his speed or apply his brakes and the car after the accident traveled a distance of 30 feet south of the point of impact and into the ditch.

In his closing argument to the jury, counsel for plaintiffs made a big point over the failure of the truck driver to stop his truck.[1]

1. Now, as I said, sometimes the light comes, and it sometimes comes in a different light and from a different avenue. I was shocked—perhaps you were—and if you were following this argument, because it's exactly the same thing that I talked to you about in my opening argument: That Strohecker, seeing—according to his testimony—our automobile—the Gelfand automobile—on its wrong side of the road in front of him, coming towards him, never did a thing to stop his automobile until he saw the vehicle going into the ditch as he says, when he was a short distance away, when he could have stopped it—and I don't think I'm wrong on this—when Strohecker testified that he could stop his vehicle in five times 21 feet or 105 feet.

But what is the excuse for it? When I say, "Why did he not apply his brakes?" Was my third question proposed to Mr. Antonelli, and here are his words:

"We were on our right side of the road; we didn't have to stop." And then in the next breath he talks about the unfortunate injuries to these people. He feels sorry for them. Too late to feel sorry for them now, Mr. Strohecker.

"We were on our right side of the road; we didn't have to stop." Forgetting the law of this situation, take the humanitarian side of it. In other words, he would have you believe that if I were traveling on my right-hand side of the road, and through some circumstances you were out on my side of the road where you didn't maybe have the right to be, according to him, that he can go right into you because "We were on our right side of the road; we didn't have to stop."

In other words, you see somebody on your side of the road; and regardless of the consequences, you drive right into them. "We were on our right side of the road; we didn't have to stop."

That may be the clue to this situation: "We were on our right-hand side of the road and didn't have to stop."

I don't think anybody could subscribe to such a rule of conduct. I say to you, in all the sincerity that I can command, that we were in the right; and the truth follows the right, and it doesn't follow the man that says, "I was on my right-hand side of the road, and I didn't have to stop. I could keep right on going regardless of the consequences."

This reasoning of counsel, which undoubtedly influenced the jury, was fallacious.

There was no credible evidence offered to the effect that the truck driver, in the exercise of ordinary care, could have stopped his truck in time to have averted the accident. On the contrary, the uncontroverted proof shows that, at the rate of speed which the Cadillac was traveling in the opposite direction (35 miles an hour), which was not lessened, the collision would have occurred, even if the truck had been brought to a complete stop. Hence speed of the truck could not have been a proximate cause of plaintiffs' injuries.

■ In this case, the assured clear distance rule does not apply. Hangen v. Hadfield, 135 Ohio St. 281, 20 N.E. 2d 715. Nor would the doctrine of last clear chance (which was not pleaded or proved) apply because the negligence of Gelfand continued up to the time of the collision. Patterson v. George F. Alger Co., supra.

The Court will now consider the effect of the answers of the jury to Interrogatories Nos. 1, 2 and 4.

Interrogatories Nos. 1 and 2 were drawn in conformity with the decision in Davison v. Flowers, 123 Ohio St. 89, 174 N.E. 137, which holds that where more than one specific act of negligence is pleaded, the defendant is entitled to a request for a finding eliciting from the jury *of what particular act or acts of negligence they find the defendant guilty.* (3rd Syl.)

■ The purpose of interrogatories is to give the parties an opportunity to ascertain whether the jury has understood and applied the law to the proven facts. Elio v. Akron Transportation Co., 147 Ohio St. 363, 71 N.E.2d 707.

■ The interrogatories, under federal practice, should elicit facts, on which carelessness or contributory negligence, is sought to be predicated. Carpenter v. Baltimore & Ohio R. Co., 6 Cir., 109 F.2d 375.

In answer to Interrogatory No. 1, the jury found that defendant was negligent and as to the particulars answered: "Not using due caution considering weather conditions of the highway."

The Court had submitted the following specifications of negligence to the jury:

1. In that it failed to keep its truck under control.

2. In operating its truck at an unreasonable rate of speed.

3. In that it operated its truck onto plaintiffs' right-hand portion of the highway, to wit: the westerly half thereof, so as to cause the driver of the automobile in which plaintiffs were riding to attempt to avoid an imminent collision, thereby forcing him to operate his automobile onto his left-hand side of the highway, to wit: the easterly portion of said Route 90.

4. In failing to slacken the speed of the truck or to stop the same.

The answer of the jury, giving it a liberal construction, means that defendant did not exercise ordinary care, considering the weather, and the conditions of the highway. "Caution" and "care" mean the same thing. We should not be particular about proper punctuation in the jury's answer.

■ In effect, the jury said that the defendant was negligent because it failed to use due care considering weather and highway conditions. The jury did not find in what respect or respects the defendant was negligent which the interrogatory sought to elicit. The Court was without right to require the jury to amplify its answers. Elio v. Akron Transportation. Co., supra. In any event, the jury did. not find that the defendant was guilty of negligence in any of the particular acts or specifications with which it was. charged in the complaint and which. the Court had submitted to the jury.

Because the jury did not find in its answer to Interrogatory No. 1, that the defendant was guilty of any of the four specifications of negligence charged, this operated as a finding against the plaintiffs, who had the burden of proof. Masters v. N. Y. Central R. Co., 147 Ohio St. 293, 70 N.E. 2d 898; Miljak v. Boyle, 93 Ohio App. 169, 112 N.E.2d 340; Mills v. City of Cleveland, 97 Ohio App. 78, 117 N.E.2d 471.

 An interrogatory which sought merely to determine whether the defendant was negligent, without requiring the determination of the supporting facts would be improper. Davison v. Flowers, supra; Carpenter v. Baltimore & O. R. Co., supra. Such an interrogatory would elicit a bare conclusion without facts to support it.

Even if such an interrogatory had been proper, a finding of the jury that the defendant was negligent in any respect would not be supported by the evidence.

Furthermore, it is not understandable how the jury could find the same acts of negligence against both Gelfand and the truck driver as their acts were certainly different. One was on his wrong side of the road, and the other on his right side, but the jury did not differentiate.

The answer of the jury to Interrogatory No. 4, insofar as it finds that such negligence of defendant was a proximate cause of plaintiffs' injuries is contrary to the evidence and must be set aside.

Reasonable minds can reach but one conclusion in this case and that is that the negligence of Gelfand was the sole proximate cause of the injuries sustained by his wife and children.

 The jury having determined that the truck was not the cause of Gelfand being on the wrong side of the road, the clear uncontroverted facts show, that only his negligence in driving on the wrong side of the road, without any valid excuse, was the proximate cause. On the evidence in this case, the question of proximate cause became one of law for the Court to determine. Cobb v. Bushey, 152 Ohio St. 336, 89 N.E.2d 466.

The verdicts of the jury and the judgments, the jury's answer to Interrogatory No. 1 and so much of the jury's answer to Interrogatory No. 4 which finds that negligence of defendant was a proximate cause of plaintiffs' injuries, are vacated and set aside and judgment will be entered in favor of defendant dismissing the several complaints.